UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------

DAN DANIELIAN,

                Plaintiff,

        v.

KALEYRA, INC., AVI S. KATZ, DARIO CALOGERO, EMILIO HIRSCH, MATTEO LODRINI, JOHN J. MIKULSKY, KATHLEEN MILLER, NEIL MIOTTO, and KARIN-JOYCE TJON,

                Defendants.

Case No. 23-cv-7988

**COMPLAINT FOR (I) VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND (II) BREACHES OF FIDUCIARY DUTY UNDER DELAWARE LAW**

**JURY TRIAL DEMANDED**

Plaintiff Dan Danielian ("Plaintiff"), by the undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to Plaintiff's own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## NATURE OF THE ACTION

1.    This action is brought by Plaintiff against Kaleyra, Inc. ("Kaleyra" or the "Company") and the members of the Company's Board ("Board") for (i) violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"), and (ii) breaches of fiduciary duties under Delaware law. Plaintiff's claims arise in connection with the solicitation of public stockholders of Kaleyra to, *inter alia*, vote in favor of a merger transaction ("Merger") pursuant to which Kaleyra will merge

with affiliates of Tata Communications Limited ("Tata"), in exchange for payment of $7.25 per share in cash by Tata to Kaleyra stockholders.

2. On June 28, 2023, Kaleyra announced that the Board had approved the sale of the Company to Tata for $7.25 per share in cash ("Merger Consideration"), pursuant to a merger agreement ("Merger Agreement").

3. On August 17, 2023, Defendants authorized the filing of a false and misleading definitive proxy on Schedule 14A ("Proxy") with the SEC with the aim of soliciting Kaleyra stockholders to vote for the Merger. As detailed below, the Proxy contains material omissions, and therefore (i) violates Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, and (ii) constitutes a breach of the Board's fiduciary duties under Delaware law.

4. The Proxy advises that a special meeting of Kaleyra stockholders will be held on September 28, 2023, to vote on the Merger ("Stockholder Vote").

5. The material misrepresentations and omissions in the Proxy must be cured in advance of the Stockholder Vote to enable Kaleyra stockholders to cast informed votes with respect to the Merger. Therefore, Plaintiff seeks to enjoin the Defendants from taking any further steps to consummate the Merger and schedule the Stockholder Vote, until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages suffered by Plaintiff and other Kaleyra stockholders as a result of such violations, and/or seek other appropriate relief.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction). The Court has subject

matter jurisdiction over the claims for breach of fiduciary duty under Delaware law under 28 U.S.C. § 1367 (providing supplemental jurisdiction over all other claims that are related to claims in the action within the Court's original jurisdiction).

7.     This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at \*5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being hauled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiff's securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at \*23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

8.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "KLR" on The New York Stock Exchange, which is headquartered in this District, and the false and misleading Proxy was filed with the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer

fraud prosecution appropriate in District).

## PARTIES

9.      Plaintiff is and has been a stockholder of Kaleyra common stock at all relevant times.

10.     Defendant Kaleyra is a Delaware corporation with its principal executive offices located at 85 Broad Street, New York, New York 10004. Kaleyra provides mobile communication services for enterprises of all sizes worldwide, including text messaging, push notifications, e-mail, instant messaging, voice services and chatbots. One of Kaleyra's subsidiaries is The Campaign Registry, Inc. ("TCR"), which works with North American mobile network operators and companies in the messaging business to register text messaging campaigns.

11.     Defendant Avi S. Katz ("Katz") has served as the Chairman of the Board since the Company's IPO in November 2019, when it combined with GigCapital, Inc., a company founded by Katz. Katz owned approximately 2.81% of the Company's shares as of July 27, 2023.

12.     Defendant Dario Calogero ("Calogero") serves as the Chief Executive Officer of the Company and has been a member of the Board since the Company was founded in 1999. Calogero is an affiliate of Maya Investments Limited ("Maya"), which owned approximately 11.44% of the Company's shares as of July 27, 2023.[1]

13.     Defendant Emilio Hirsch, Ph.D. ("Hirsch") has served as a member of the Board at all relevant times. Hirsch is an affiliate and director of Esse Effe, S.p.A., a company formed under the laws of Italy ("Esse Effe"). Esse Effe and its affiliates are the Company's largest stockholders owning approximately 12.77% of the Company's shares as of July 27, 2023.

---

[1] On December 12, 2022, Kaleyra announced that Calogero would be stepping down from his position as CEO of the Company. Calogero has remained in the CEO role while the Board searches for a new CEO.

14. Defendant Matteo Lodrini ("Lodrini") has served as a member of the Board at all relevant times.

15. Defendant John J. Mikulsky ("Mikulsky") has served as a member of the Board at all relevant times.

16. Defendant Kathleen Miller ("Miller") has served as a member of the Board at all relevant times

17. Defendant Neil Miotto ("Miotto") has served as a member of the Board at all relevant times.

18. Defendant Karin-Joyce Tjon ("Tjon") has served as a member of the Board at all relevant times.

19. Defendants identified in paragraphs 11 to 18 are collectively referred to herein as the "Individual Defendants," and together with Kaleyra, collectively, the "Defendants."

**SUBSTANTIVE ALLEGATIONS[2]**

**Alternative Transaction Proposals Submitted to the Board**

20. On June 9, 2022, the Company received an unsolicited proposal ("TCR Proposal") from TCR Acquisition Corporation, LLC ("TCR Acquisition") to purchase TCR from the Company. The proposed purchase price to be paid was based on a multiple of TCR's revenue. The Board unanimously concluded, based on, among other things, the tentative price to be paid, the identity of the prospective purchasers, and the purported financing, that the unsolicited, non-binding proposal from TCR Acquisition significantly undervalued TCR, and was not in the best interests of the Company and its stockholders. The Proxy, however, fails to disclose the price that TCR Acquisition offered to pay for TCR, which prevents Kaleyra stockholders from comparing

---

[2] Any emphasis in quoted language is added, unless otherwise noted.

that price to the Merger Consideration paid for the Company as a whole.

21.    On August 3, 2022, the Board approved the formation of a strategic transaction committee ("Strategic Transaction Committee") to assist the Board in evaluating and reviewing potential strategic transactions, and to make recommendations to the Board. The Strategic Transaction Committee was comprised of Defendants Katz (as chairman), Lodrini and Calogero.

22.    By the end of September 2022, the Company had received preliminary indications of interest from two strategic bidders for a strategic merger or combination, and the Company provided access to diligence materials to both bidders in order to facilitate their assessment of a potential transaction.

23.    On September 29, 2022, the Board met to discuss the proposals received from the two strategic bidders. One of the bidders ("Entity A") proposed a possible cash transaction pursuant to which Entity A, a private company, would acquire the Company for a "modest premium" and take the Company private ("Entity A Proposal"). Following the meeting, a representative of the Strategic Transaction Committee had a phone conversation with a representative of Entity A. During this conversation, the representative of the Strategic Transaction Committee noted that the Company had outstanding $200 million principal amount of convertible notes ("Convertible Notes") and asked for confirmation as to whether this proposal included assumption of these notes. The representative of Entity A was unable to confirm the proposal included assumption of the Convertible Notes and stated that he would need to respond after checking with others from Entity A. Following this conversation, the Company did not receive this confirmation and did not receive an updated proposal from Entity A.

24.    The other bidder ("Entity B"), a public company with stock listed on an overseas exchange, proposed a merger with the Company, which was structured as a stock for stock

6

exchange ("Entity B Proposal"). The Board authorized its legal advisor to conduct an analysis of the ramifications of such a transaction under the Company's Convertible Notes indenture and authorized Company management to prepare a financial analysis of the combined company.

25.     Subsequently, the members of the Strategic Transaction Committee, after taking into consideration then current market conditions, the potential value to shareholders, and the ability of the bidders to consummate a transaction, decided that neither the Entity A Proposal nor the Entity B Proposal were in the best interest of the Company and its stockholders, and therefore did not recommend to the full Board to further pursue either transaction. The Proxy, however, fails to disclose the consideration per share offered in either the Entity A Proposal or the Entity B Proposal, which prevents Kaleyra stockholders from comparing the value offered by those Proposals to the Merger Consideration.

**Negotiation of the Merger With Tata**

26.     On January 6, 2023, Katz received an unsolicited email from representatives of Tata's financial advisor, Lazard, requesting a meeting to discuss a potential acquisition of the Company by Tata.

27.     On January 24, 2023, the Company entered into a confidentiality agreement with Tata.

28.     On March 12, 2023, Katz received a non-binding letter of intent and draft exclusivity agreement from Tata Communications, which included a purchase price range of $7.00-$8.00 per share.

29.     On March 14, 2023, the Board authorized the Company to enter into an exclusivity agreement with Tata, and pursue a potential transaction with Tata.

30.     On April 20, 2023, the Board formed a new committee ("Special Committee") to

manage the negotiation of a potential transaction with Tata. The Board appointed (i) Katz as chairman of the Special Committee, and (ii) Hirsch, Lodrini, Miller, Mikulsky, Miotto and Tjon as the other members of the Special Committee.

31.     On June 27, 2023, after further negotiations, the parties reached agreement on $7.25 per share in cash as the Merger Consideration. Later that day, Northland Securities, Inc. ("Northland") provided the Board with a fairness opinion ("Fairness Opinion") concluding that the Merger Consideration was fair to Kaleyra stockholders.

32.     On June 28, 2023, the Tata and Kaleyra issued a joint press release announcing the Merger.

**The Proxy Contains Material Omissions**

33.     Defendants disseminated a false and misleading Proxy to Kaleyra stockholders that misrepresents or omits material information, and thus deprives Plaintiff and other Kaleyra stockholders of their right to cast informed votes with respect to the Merger.

***Material Omissions Concerning the TCR Proposal, Entity A Proposal and Entity B Proposal***

34.     Under Delaware law, once a board makes a partial disclosure in a proxy concerning the history leading up to the approval of a transaction, the board is obligated to provide the stockholders with a full and accurate disclosure of that history, including disclosure of the amounts of the bids in any proposals for alternative transactions submitted by other bidders. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280-82 (Del. 1994) ("once defendants traveled down the road of partial disclosure of the history leading up to the Merger and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events," and thus failure to disclose $275 million bid for subsidiary of target was a material omission). The same standard of disclosure applies in the

Second Circuit. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (even when there is no independent duty to disclose information on a certain topic, "once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

35. Here, the Proxy makes partial disclosures concerning the existence of alternative proposals to either (i) separately acquire TCR (i.e., the TCR Proposal), or (ii) acquire the Company as a whole (i.e., the Entity A and Entity B Proposals) (collectively, the "Alternative Proposals"). The Proxy, however, fails to disclose the (i) proposed purchase price in the TCR Proposal, (ii) the proposed purchase price in the Entity A Proposal (which proposed a cash deal), and (iii) the implied value of Kaleyra's equity in the Entity B Proposal (which proposed a stock-for-stock deal).

36. Under both federal and Delaware law, the Proxy may not make only partial disclosures concerning the Alternative Proposals, and instead must also disclose the proposed consideration per Kaleyra share in each of the Alternative Proposals in order to enable Kaleyra stockholders to compare the Alternative Proposals with the Merger, and thereby cast informed votes with respect to the Merger. Further, the omission of information concerning the Alternative Proposals from the Proxy renders statements in the Proxy concerning the Alternative Proposals misleading since, absent such information, reasonable Kaleyra stockholders will be misled into believing that the Alternative Proposals did not offer as much value to Kaleyra stockholders as the Merger when, in fact, that may not be the case. In sum, Kaleyra stockholders are entitled to full disclosure concerning the Alternative Proposals to decide for themselves whether the Merger represents the best alternative.

*Material Omissions Concerning the Projections and Cash Flows*

37.     The failure of a company to disclose management projections in a proxy when those projections have been used by a financial advisor to render a fairness opinion, is a material omission under both federal and Delaware law.

38.     Here, the Proxy discloses that the Fairness Opinion was based in part on "projected financial statements for the calendar years ending December 31, 2023, December 31, 2024 and December 31, 2025, prepared by [the Company's] management, and (ii) "projected financial information for the calendar years ending December 31, 2026, December 31, 2027 and December 31, 2028, prepared by [the Company's] management" (collectively, the "Projections").

39.     Further, the Proxy discloses that the Projections were used to forecast the unlevered, after-tax free cash flows ("Cash Flows") that the Company would generate during the calendar years ending December 31, 2023 through December 31, 2028. Northland then prepared a *Discounted Cash Flow Analysis* purporting to calculate the estimated present value of the Cash Flows as of June 27, 2023.

40.     The Proxy, however, purports to disclose only a "summary" of the Projections, and does not disclose the Cash Flows. Specifically, for the years 2023-2025, the Proxy discloses Revenue, Gross Profit, Net Income/Loss, and Adjusted EBITDA, but for the years 2026-2028, the Proxy only discloses Adjusted EBITDA. Accordingly, the disclosures for the years 2026-2028 are improper partial disclosures that omit key financial information necessary to enable Kaleyra stockholders to adequately evaluate the Projections for the years 2026-2028, and Northland's *Discounted Cash Flow Analysis* (which relies on the Projections to calculate the Cash Flows for those years). Therefore, the Proxy must also disclose the Revenue, Gross Profit, and Net

Income/Loss for the years 2026-28. For the same reason, the Proxy must also disclose the Cash

Flows that Northland used to prepare its *Discounted Cash Flow Analysis.*

**Material Omissions Concerning the Fairness Opinion**

41.    A financial advisor's fairness opinion is one of the most important process-based

underpinnings of a board's recommendation of a transaction to its stockholders. Here, the Proxy's

presentation of Northland's Fairness Opinion improperly failed to disclose certain key information

underlying the analyses on which such Fairness Opinion was based. Without this information, as

described below, Kaleyra stockholders are unable to fully understand these analyses, and thus are

unable to determine what weight to place on the Fairness Opinion in determining whether to vote

for the Merger. This omitted information, if disclosed, would significantly alter the total mix of

information.

*Selected Public Companies Analysis*

42.    With respect to Northland's *Selected Public Companies Analysis*, the Proxy

discloses the names of six public companies that Northland identified that it deemed similar to

Kaleyra with respect to one or more criteria. Northland then collected data with respect to these

six companies:

> Northland reviewed data, including EV, last twelve months ("LTM") revenue,
> calendar year 2023 estimated revenue, calendar year 2024 estimated revenue,
> calendar year 2025 estimated revenue, LTM gross profit, calendar year 2023
> estimated gross profit, calendar year 2024 estimated gross profit, calendar year
> 2025 estimated gross profit, calendar year 2023 estimated earnings before interest,
> taxes, depreciation and amortization ("EBITDA"), calendar year 2024 estimated
> EBITDA, and calendar year 2025 estimated EBITDA of each of the selected
> publicly traded companies described above, the operations of which Northland
> deemed similar for purposes of this analysis, based on its professional judgement
> and experience. The multiples for each of the selected companies were calculated
> using their respective closing prices on June 27, 2023 and were based on the most
> recent publicly available information through S&P Capital IQ.

43.     Based on the data collected, Northland prepared the following table appearing in the Proxy:

| | Low | Mean | Median | High |
|---|---|---|---|---|
| LTM revenue multiples | 0.6x | 1.1x | 1.1x | 1.3x |
| Calendar year 2023 estimated revenue multiples | 0.6x | 1.1x | 1.1x | 1.3x |
| Calendar year 2024 estimated revenue multiples | 0.6x | 1.0x | 1.0x | 1.2x |
| Calendar year 2025 estimated revenue multiples | 0.6x | 0.9x | 0.9x | 1.2x |
| LTM gross profit multiples | 0.5x | 2.6x | 2.4x | 5.3x |
| Calendar year 2023 estimated gross profit multiples | 0.4x | 2.5x | 2.4x | 4.7x |
| Calendar year 2024 estimated gross profit multiples | 0.3x | 2.2x | 2.1x | 4.1x |
| Calendar year 2025 estimated gross profit multiples | 0.3x | 1.9x | 1.6x | 3.5x |
| Calendar year 2023 estimated EBITDA multiples | 1.8x | 9.3x | 8.6x | 16.2x |
| Calendar year 2024 estimated EBITDA multiples | 1.1x | 7.2x | 7.4x | 13.8x |
| Calendar year 2025 estimated EBITDA multiples | 0.9x | 6.3x | 7.1x | 10.3x |

44.     Northland then applied the low to high LTM and calendar years 2023, 2024, and 2025 revenue multiples and gross profit multiples described in the table above derived from the selected public companies to the corresponding data of the Company. This analysis indicated approximate (i) implied enterprise value reference ranges for the Company of approximately $221 million to $438 million, $230 million to $451 million, $262 million to $501 million, and $302 million to $578 million based on LTM revenue of approximately $342 million and 2023, 2024, and 2025 revenue estimates of approximately $356 million, $412 million, and $486 million, respectively, and (ii) implied enterprise value reference ranges for the Company of approximately $34 million to $386 million, $35 million to $381 million, $31 million to $396 million, and $35 million to$418 million based on LTM gross profit of approximately $74 million and 2023, 2024, and 2025 gross profit estimates of approximately $81 million, $96 million and $120 million, respectively.

45.     Northland then applied the low to high calendar years 2023, 2024, and 2025 EBITDA multiples to the corresponding data of the Company. This analysis indicated approximate implied enterprise value reference ranges for the Company of approximately $52 million to $473 million, $42 million to $498 million, and $48 million to $555 million based on 2023, 2024,and

2025 adjusted EBITDA estimates of approximately $29 million, $36 million, and $54 million, respectively.

46.     The implied enterprise values from the analyses above were then compared to the Company's EV of $259 million based on the Merger Consideration.

47.     Northland's *Selected Public Companies Analysis* is highly dependent on the selection of the six public companies included in the analysis. The Proxy, however, fails to provide any specific financial information concerning any of these six public companies. The absence of such information prevents Kaleyra stockholders from being able to evaluate the validity of Northland's *Selected Public Companies Analysis.* At a minimum, the Proxy should disclose the EV of each of the six public companies, and the relevant multiple for each company for each of the metrics in the table above, to enable Kaleyra stockholders to fairly compare those companies to Kaleyra. *See In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *32 (Del. Ch. Mar. 23, 2012) ("as a matter of best practices, a fair summary of a comparable companies or transactions analysis probably should disclose the market multiples derived for the comparable companies or transactions."), *rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012); *Turberg v. ArcSight, Inc.*, C.A. No. 5821-VCL, at 43 (Del. Ch. Sept. 20, 2011) (TRANSCRIPT) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be in there, just like they're in there when you give them to the board. ... [Y]ou would never see a board book that would go to the board without the background multiples.").

48.     While the data used in the *Selected Public Companies Analysis* is public information, "[d]isclosures are not supposed to send stockholders on a scavenger hunt," and "[t]o assume that a stockholder could assemble this information [from multiple public sources] 'would create a 'super' shareholder standard and create almost limitless opportunities for deception of the

'reasonable' shareholder.'" *Goldstein v. Denner*, 2022 WL 1671006, at \*25 (Del. Ch. May 26, 2022).

*Selected Precedent Transactions Analysis*

49.     With respect to Northland's *Selected Precedent Transactions Analysis*, the Proxy discloses that Northland compared publicly available statistics for six transactions that closed after January 1, 2019, and involved companies deemed similar to the Company according to one or more criteria. Based on the data collected, Northland prepared the following table appearing in the Proxy:

|  | Low | Mean | Median | High |
|---|---|---|---|---|
| LTM revenue multiples | 0.6x | 1.2x | 0.9x | 2.1x |
| LTM EBITDA multiples | 7.6x | 11.9x | 11.5x | 16.8x |

50.     Northland then applied the low to high LTM revenue and EBITDA multiples described in the table above derived from the six selected precedent transactions to the corresponding data of the Company. This analysis indicated approximate implied enterprise value reference ranges for the Company of approximately $190 million to $732 million and approximately $136 million to $299 million based on LTM revenue of approximately $342 million and adjusted EBITDA of approximately $18 million, respectively, as compared to the Company's EV of $259 million based on the Merger Consideration.

51.     Northland's *Selected Precedent Transactions Analysis* is highly dependent on the selection of the six precedent transactions included in the analysis. The Proxy, however, fails to provide any information concerning any of these six transactions. The absence of such information prevents Kaleyra stockholders from being able to evaluate the validity of Northland's *Selected Precedent Transactions Analysis*. At a minimum, the Proxy should disclose the EV of each of the target companies in each of the six precedent transactions, and the relevant multiples for each such

target company for each of the metrics in the table above, to enable Kaleyra stockholders to fairly compare those transactions to the Merger. *See* authorities *supra*.

*Discounted Cash Flow Analysis*

52.    With respect to Northland's *Discounted Cash Flow Analysis*, the Proxy discloses that Northland used a range of discount rates of 10.0% to 16.0%, but fails to adequately disclose how Northland determined that range was appropriate. The explanation that the discount rate range was "derived from a weighted cost of capital calculation" is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments that Northland used. Ensuring that Northland used an appropriate discount rate in its DCF analysis is material to Kaleyra stockholders since if the discount rate range used by Northland was artificially high, it would have depressed the value ranges generated for Kaleyra's shares. *See In re Topps Co. S'holders Litig*., 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range).

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

53.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

54.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or ***which omits to state any material fact necessary in order to make the statements therein not false or misleading*** or necessary to correct any statement in any earlier communication

with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

55.    In particular, even when there is no independent duty to disclose information on a certain topic in a proxy, once a proxy addresses a topic, there is a duty under the federal securities laws to tell the whole truth concerning that topic, and not omit material facts concerning that topic that the render the statements in the proxy concerning the topic misleading.

56.    Defendants disseminated a false and misleading Proxy, which omitted material facts necessary to make statements made in the Proxy, in light of the circumstances under which they were made, not misleading.

57.    By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to omit material facts from the Proxy necessary to make statements made in the Proxy—in light of the circumstances under which they were made—not misleading.

58.    Yet, as specified above, Defendants omitted material facts from the Proxy necessary to make statements in the Proxy— in light of the circumstances under which they were made—not misleading, in connection with soliciting Kaleyra stockholders to vote in favor of the Merger. Defendants were at least negligent in filing the Proxy with these material omissions.

59.    The omissions from the Proxy alleged herein were material insofar as a reasonable Kaleyra stockholder would view disclosure of the omitted facts specified above as significantly altering the "total mix" of information made available to Kaleyra stockholders. In other words, the alleged omissions were not so obviously unimportant to a reasonable Kaleyra stockholder that reasonable minds could not differ on the question of their importance.

60.    Since, according to the Proxy, Kaleyra cannot consummate the Merger unless the proposal to adopt the Merger Agreement is approved by the affirmative vote of the holders of at

least a majority of the outstanding shares of Kaleyra common stock entitled to vote as of the record date, the Proxy soliciting the votes of Kaleyra stockholders is an essential link in the accomplishment of the Merger. Thus, causation is established.

61.     Plaintiff and other Kaleyra stockholders have no adequate remedy at law, and are threatened with irreparable harm insofar as Plaintiff and other Kaleyra stockholders will be deprived of their entitlement to cast fully informed votes with respect to the Merger if the material omissions alleged herein are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

62.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of Kaleyra within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers of Kaleyra, and/or as members of the Kaleyra Board, and participation in, and/or awareness of Kaleyra's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Kaleyra with respect to the Proxy, including the contents of the Proxy that are materially false and misleading by virtue of the material omissions specified above. Indeed, the Proxy states that the Board is "furnishing this proxy statement to the Company's stockholders as part of the solicitation of proxies by the Board for use at the Special Meeting. This proxy statement provides the Company's stockholders *with the information they need to know to be able to vote or instruct their vote to be cast at the Special Meeting*." The Proxy further sets forth

17

the unanimous recommendation of the Board that Kaleyra stockholders vote for the Merger.

64. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65. Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same.

66. By virtue of the foregoing, the Individual Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

67. Plaintiff and other Kaleyra stockholders have no adequate remedy at law, and as a result of the Individual Defendants' violations of Section 20(a) of the Exchange Act, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger. Therefore, injunctive relief is appropriate.

## COUNT III

### Against the Individual Defendants for
### Breach of Fiduciary Duty Under Delaware Law

68. Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

18

69.     The Individual Defendants, as directors of a Delaware corporation, owed Plaintiff and other Kaleyra stockholders fiduciary duties of due care, good faith, candor, and loyalty under Delaware law.

70.     The Individual Defendants breached their fiduciary duties under Delaware law by omitting material facts from the Proxy that were necessary for Plaintiff and other Kaleyra stockholders to know in order to cast fully informed votes with respect to the Merger.

71.     The facts omitted from the Proxy as detailed above were material because there is a substantial likelihood that a reasonable Kaleyra Stockholder would have viewed disclosure of such facts as having significantly altered the 'total mix' of information made available.

72.     As a result of the Individual Defendants' breaches of fiduciary duty, Plaintiff and other Kaleyra stockholders will be harmed by being deprived of their right to cast fully informed votes with respect to the Merger.

73.     Plaintiff and other Kaleyra stockholders have no adequate remedy at law, and as a result of the Individual Defendants' breaches of fiduciary duty, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger. Therefore, injunctive relief is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Kaleyra stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

B.      Finding Defendants liable for violating Sections 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

C.      Finding the Individual Defendants liable for violating Section 20(a) of the Exchange Act, and breaching their fiduciary duties under Delaware law;

D.      Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff and other Kaleyra stockholders rescissory damages;

E.      Directing Defendants to account to Plaintiff and other Kaleyra stockholders for all damages suffered as a result of their misconduct;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

G.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 11, 2023                  **WOHL & FRUCHTER LLP**


By:/s *Joshua E. Fruchter*
Joshua E. Fruchter (JF2970)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6588
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*